Document Number Case Number
039        05-C-0025-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
06/03/2005 05:46:12 PM CDT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRIGGS & STRATTON CORPORATION,

      Plaintiff and Counterclaim Defendant,

   v.                                      Case No. 05-C-0025 C

KOHLER CO.,

      Defendant and Counterclaim Plaintiff.

---

## KOHLER COMPANY'S MEMORANDUM IN OPPOSITION TO "BRIGGS & STRATTON'S MOTION TO DISMISS KOHLER'S ANTITRUST COUNTERCLAIMS OR IN THE ALTERNATIVE FOR SEVERANCE OF THOSE CLAIMS"

---

David J. Harth
Charles G. Curtis, Jr.
David E. Jones
Christopher G. Hanewicz
David L. Anstaett
HELLER EHRMAN LLP
One East Main Street
Suite 201
Madison, Wisconsin  53703-5118
Tel:  (608) 663-7460
Fax:  (608) 663-7499

Robert A. Rosenfeld
Scott A. Westrich
Kerry C. Klein
HELLER EHRMAN LLP
333 Bush Street
San Francisco, California  94104-2878
Tel:  (415) 772-6000
Fax:  (415) 772-6268

*Attorneys for Defendant and
Counterclaim Plaintiff Kohler Co.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT .......................................... 1

II.     FACTUAL BACKGROUND ............................................................................................... 2

III.    ARGUMENT .......................................................................................................................... 4

        A.      Briggs Misconstrues the Applicable Pleading Requirements. ................................. 4

        B.      Kohler Has Standing as a Competitor To Assert Claims for
                Unlawful Bundled Pricing and Exclusive Dealing. ................................................. 6

        C.      Kohler Has Stated a Claim Under Section Two of the Sherman
                Act. ........................................................................................................................... 9

                1.      Kohler Has Alleged that Briggs Has Monopoly Power. ............................ 9

                2.      Kohler Has Pled Exclusionary Conduct by Briggs. ................................. 11

                        a.  Section Two Claims Are Not Confined to Narrow
                            Categories of Conduct ........................................................... 11

                        b.  Kohler Has Properly Alleged a Section Two Claim
                            Based on Unlawful Bundled Pricing ....................................... 13

                        c.  Kohler Has Properly Alleged a Section Two Claim
                            Based on Unlawful Exclusive Dealing .................................... 16

        D.      Kohler Has Stated a Claim Under Section One of the Sherman
                Act. ......................................................................................................................... 19

        E.      Kohler Has Stated a Claim Under Wisconsin Antitrust Law. ............................... 21

        F.      Kohler Has Stated a Claim for Common Law Interference with
                Prospective Contractual Relations. ...................................................................... 25

        G.      This Court Should Not Sever Kohler's Antitrust Counterclaims
                from the Rest of This Action. ................................................................................. 27

                1.      Briggs Has Identified No Joinder Defects or Similar
                        Problems that Would Justify a Rule 21 Severance. .................................. 30

2.    All of Briggs's Concerns About Potential Juror
      Confusion and Trial Delay Can Be Accommodated
      Through the Less Drastic Remedy of a Rule 42(b)
      Separation of Trials. ................................................................. 33

3.    Briggs's Attempt To Use Rule 21 To Steer Any
      Antitrust Appeal to the Seventh Circuit Violates the
      Governing Jurisdictional Statutes and Is Impermissible
      Forum Shopping. ...................................................................... 34

IV.   CONCLUSION ......................................................................................... 37

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Abbott Labs. v. Brennan*,
 952 F.2d 1346 (Fed. Cir. 1991) ............................................................. 35

*Advo, Inc. v. Philadelphia Newspapers, Inc.*,
 51 F.3d 1191 (3d Cir. 1995) ................................................................... 15

*Apotex, Inc. v. Thompson*,
 347 F.3d 1335 (Fed. Cir. 2003) .......................................................... 35-36

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
 472 U.S. 585 (1985) .......................................................................... 11-12

*Atari, Inc. v. JS & A Group, Inc.*,
 747 F.2d 1422 (Fed Cir. 1984) .............................................. 28, 33, 35-37

*Aura Lamp & Lighting, Inc. v. Int'l Trading Corp.*,
 325 F.3d 903 (7th Cir. 2003) ................................................................. 36

*Avery Dennison Corp. v. Acco Brands, Inc.*,
 No. CV99-1877DT (MCX), 2000 WL 986995
 (C.D. Cal. Feb. 22, 2000) ................................................................... 13-14

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
 784 F.2d 1325 (7th Cir. 1986) ............................................................... 10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Co.*,
 509 U.S. 209 (1993) ....................................................................8, 15, 22-25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977) .............................................................................. 6

*Car Carriers, Inc. v. Ford Motor Co.*,
 745 F.2d 1101 (7th Cir. 1984) ................................................................. 5

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
 148 F.3d 1080 (D.C. Cir. 1998) ............................................................. 11

*Christianson v. Colt Indus. Operating Corp.*,
 486 U.S. 800 (1988) ......................................................................... 34-35

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) ................................................................... 12

*City of Mishawaka v. Am. Elec. Power Co.*,
   616 F.2d 976 (7th Cir. 1980) ..................................................................... 12

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ............................................................. 15, 18

*Conley v. Gibson*,
   355 U.S. 41 (1957) ...................................................................................... 4

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ................................................................................... 12

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
   8 F.3d 1217 (7th Cir. 1993) ........................................................................ 9

*Dow Corning Corp. v. Surgitek, Inc.*,
   61 F.R.D. 578 (E.D. Wis. 1973) ................................................................ 28

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
   31 F.3d 506 (7th Cir. 1994) ....................................................................... 26

*Dura Pharm., Inc. v. Broudo*,
   125 S. Ct. 1627 (2005) ............................................................................. 5-6

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................... 9, 11-12, 19

*Ford v. Cascade Health Serv.*,
   No. Civ. 03-6256-TC, 2004 WL 1445523 (D. Or. June 25, 2004),
   *adopted by* 2004 WL 1557402 (D. Or. July 9, 2004)............................. 20-21

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
   394 U.S. 495 (1969) .............................................................. 11-12, 19

*Gray v. Split Rock Hardwoods, Inc.*,
   No. 01-C-0043-C, 2001 WL 34373159 (W.D. Wis. July 20, 2001) ........................... 26

*Grigsby v. Kane*,
   250 F. Supp. 2d 453 (M.D. Pa. 2003) ................................................... 28, 30

*Grigsby v. Kane*,
   No. 1:CV-99-2083, 2005 WL 348303 (MD. Pa. Feb. 2, 2005) ................................... 29

*Grigsby v. Kane*,
No. 1:CV-99-2083, 2005 WL 348305 (M.D. Pa. Feb. 9, 2005) ................................29

*Hammes v. AAMCO Transmissions, Inc.*,
33 F.3d 774 (7th Cir. 1994)........................................................................ 5

*Hewlett-Packard Co. v. GenRad, Inc.*,
882 F. Supp. 1141 (D. Mass. 1995) ........................................................28

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
425 U.S. 738 (1976) ...........................................................................4-5

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
86 F.R.D. 694 (E.D.N.C. 1980)...............................................................28

*Implant Innovations, Inc. v. Nobelpharma AB*,
No. 93 C 7489, 1996 WL 568791 (N.D. Ill. Oct. 2, 1996) ...................... 27-28

*In re BBC Int'l, Ltd.*,
99 F.3d 811 (7th Cir. 1996)...................................................................... 36

*In re Copper Antitrust Litig.*,
98 F. Supp. 2d 1039 (W.D. Wis. 2000).......................................................5

*In re High Fructose Corn Syrup Antitrust Litig.*,
293 F. Supp. 2d 854 (C.D. Ill. 2003) ....................................................... 30

*In re Innotron Diagnostics*,
800 F.2d 1077 (Fed. Cir. 1986), *overruled on other grounds*, 141 F.3d
1059 (1998) ..................................................................................... 28, 34

*Insolia v. Philip Morris, Inc.*,
186 F.R.D. 547 (W.D. Wis. 1999) ........................................................... 30

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) .............................................................................17, 21

*Johnson & Johnson v. Kimberly-Clark Corp.*,
203 U.S.P.Q. 1008 (E.D. Wis. 1978) ........................................................28

*Kennedy v. Wright*,
851 F.2d 963 (7th Cir. 1988)....................................................................36

*Kohler Co. v. Briggs & Stratton Corp.*,
No. 85-C-1042, 1986 WL 946 (E.D. Wis. Mar. 13, 1986) ............................10

*Krist Oil Co., Inc. v. Bernick's Pepsi-Cola of Duluth, Inc.*,
   354 F. Supp. 2d 852 (W.D. Wis. 2005)............................................................5

*Leatherman v. Tarrant County Narcotics and Coordination Unit*,
   507 U.S. 163 (1993) ..........................................................................................5

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003), *cert. denied*, 124 S. Ct. 2932 (2004) ........................*passim*

*LePage's Inc. v. 3M*,
   No. Civ. A 97-3983, 1997 WL 734005 (E.D. Pa. Nov. 14, 1997)................................. 19

*McKenzie-Willamette Hosp. v. PeaceHealth*,
   No. Civ. 02-6032-HA, 2004 WL 3168282 (D. Or. Oct. 22, 2004)............................... 14

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
   62 F.3d 967 (7th Cir. 1995)...............................................................................4-5

*Minn. Mining and Mfg. Co. v. Appleton Papers, Inc.*,
   35 F. Supp. 2d 1138 (D. Minn. 1999) ............................................................ 8, 17

*Morales-Villalobos v. Garcia-Llorens*,
   316 F.3d 51 (1st Cir. 2003) ............................................................................. 20

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l*
   *Publ'ns, Inc.*, 63 F.3d 1540 (10th Cir. 1995) ................................................... 12

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*,
   920 F. Supp. 455 (S.D.N.Y. 1996)........................................................ 8, 13, 15

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1997)......................................................................17-18, 21

*Panduit Corp. v. All States Plastic Mfg. Co.*,
   744 F.2d 1564 (Fed. Cir. 1984) ....................................................................... 33

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) ...................................................................8-9, 14, 17

*Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*,
   958 F. Supp. 992 (E.D. Pa. 1997) ................................................................... 32

*Rozema v. Marshfield Clinic*,
   Nos. 96-C-592-C, 96-C-916-C, 96-C-730-C, 1997 WL 416292
   (W.D. Wis. Mar. 10, 1997) ..................................................................... 5, 10, 21

vi

*Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994)....................................................................4-5, 10

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ...................................................................................4

*Shank v. William R. Hague, Inc.*,
    192 F.3d 675 (7th Cir. 1999)................................................................. 25-27

*Simpson v. Ha-Lo Indus., Inc.*,
    74 F. Supp. 2d 861 (E.D. Wis. 1999) ......................................................... 26

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) ................................................................. 8, 13

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (1989) ............................................................................. 32

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ..........................................................................16-18, 21

*Toro Co. v. Alsop*,
    565 F.2d 998 (8th Cir. 1977)................................................................... 31

*Unique Concepts, Inc. v. Manuel*,
    930 F.2d 573 (7th Cir. 1991).............................................................. 35-36

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ................................................................. 17

*United States v. Griffith*,
    344 U.S. 100 (1948) ............................................................................. 16

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ...............................................................................9

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................... 10, 12, 16-17

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...............................................................................9

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    872 F. Supp. 52 (S.D.N.Y. 1994).......................................................... 20-21

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
    190 F.3d 974 (9th Cir. 1999) ..................................................................................15

*Zenith Elecs. Corp. v. Exzec, Inc.*,
    182 F.3d 1340 (Fed. Cir. 1999) ............................................................................35

**Wisconsin Cases**

*Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*,
    190 Wis. 2d 650, 529 N.W.2d 905 (Wis. 1995) ..............................................23

*Conley Publ'g Group Ltd. v. Journal Communications*,
    No. 00-CV-000222, 2001 WL 1860574 (Wis. Cir. Ct. Oct. 2, 2001) ......................24-25

*Conley Publ'g Group Ltd. v. Journal Communications, Inc.*,
    2003 WI 119, 265 Wis. 2d 128, 665 N.W.2d 879 (2003) ..........................21-23

*Obstetrical & Gynecological Assocs. of Neenah, S.C. v. Landig*,
    129 Wis. 2d 362, 384 N.W.2d 719 (Ct. App. 1986) ..................................23-24

*Pure Milk Prods. Cooperative v. Nat'l Farmers Org.*,
    64 Wis. 2d 241, 219 N.W.2d 564 (1974) ..................................................... 25

*Tele-Port, Inc. v. Ameritech Mobile Communications, Inc.*,
    2001 WI App. 261, 248 Wis. 2d 846, 637 N.W.2d 782 (Ct. App. 2001) ................... 23

**Federal Statutes**

15 U.S.C. § 1 ............................................................................................................*passim*

15 U.S.C. § 2 ............................................................................................................*passim*

15 U.S.C. § 13(a) .....................................................................................................23-25

15 U.S.C. § 13(d) .....................................................................................................23-24

15 U.S.C. § 13(e) .....................................................................................................23-24

15 U.S.C. § 14 ..........................................................................................................16-17

28 U.S.C. 1295(a) ..............................................................................................32, 34-36

28 U.S.C. 1338(a) ..............................................................................................32, 34-36

Private Securities Litigation Reform Act of 1995, § 78u-4(b)(4) ................................ 6

**Wisconsin Statutes**

Wis. Stat. § 133.03 ...................................................................................... 21-23, 25

Wis. Stat. § 133.04  ..................................................................................... 21-23, 25

Wis. Stat. § 133.05 ......................................................................................... 21-25

Wis. Stat. § 133.14 ............................................................................................. 21

Wis. Stat. § 133.18 ............................................................................................. 21

**Federal Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................. 4, 18, 20, 26

Fed. R. Civ. P. 12(b)(6)............................................................................................4

Fed. R. Civ. P. 13(b) ...................................................................................... 31-32

Fed. R. Civ. P. 16(c) ......................................................................................... 34

Fed. R. Civ. P. 18(a) ......................................................................................... 31

Fed. R. Civ. P. 20(a) .................................................................................... 30-31

Fed. R. Civ. P. 21 ......................................................................................*passim*

Fed. R. Civ. P. 42(b)...................................................................................*passim*

Fed. R. Civ. P. 54(b)...................................................................................... 35-36

**Secondary Sources**

2 Phillip E. Areeda, et al., *Antitrust Law* (2d ed. 2000) ...............................................9

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2004 Supp.)...................................... 14

3 P. Areeda & D. Turner, *Antitrust Law* (1978)................................................... 11

Robert Bork, *The Antitrust Paradox* (1978) .......................................................... 11

Donald S. Chisum, *Chisum on Patents* (2004) .......................................................... 33

Robert L. Harmon, *Patents and the Federal Circuit* (6th ed. 2003) ......................................32-33

14 Herbert Hovenkamp, *Antitrust Law* (1999)..........................................................................24

4 James Wm. Moore, et al., *Moore's Federal Practice* (3d ed. 2004)................................. 29-31

7 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*
    (3d ed. 2001) .................................................................................................... 30-31

9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*
    (2d ed. 1995) .................................................................................................29

## I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

Kohler alleges in its amended counterclaims that Briggs & Stratton has harmed both Kohler and consumers by engaging in improper and predatory bundled pricing and exclusive dealing arrangements with direct customers and retailers in the market for consumer lawn tractor engines.  These allegations of illegal and monopolistic conduct provide a solid basis for Kohler's claims for damages and injunctive relief under Sections 1 and 2 of the Sherman Act, Wisconsin antitrust law, and Wisconsin common law.  Kohler filed its amended counterclaims within the time set by the Court for the amendment of pleadings.  *See* Pretrial Conference Order ¶ 2, March 7, 2005 (Docket No. 10).

Briggs's motion to dismiss Kohler's antitrust counterclaims suffers from an overly constricted view of the antitrust laws and, at the same time, an overly rigorous view of what a plaintiff is required to plead to defeat a motion to dismiss.  Thus Briggs asserts that Kohler lacks standing as a competitor to bring claims under the Sherman Act.  But it is beyond challenge that competitors have standing to assert precisely the types of claims alleged here — unlawful bundled rebates and exclusive dealing.  The Third Circuit's recent *en banc* decision in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), *cert. denied*, 124 S. Ct. 2932 (2004), is squarely on point.  Briggs devotes much of its brief to setting up "strawmen" — in the form of claims that Kohler has not asserted, such as predatory pricing and tying — that Briggs then proceeds to knock down.  At the same time, Briggs ignores a large body of case law demonstrating that Kohler's bundled pricing and exclusive dealing allegations state valid claims under both Section 1 and Section 2.

Briggs's motion also fails to come to grips with the liberal pleading requirements under the Federal Rules.  Briggs apparently wishes that notice pleading were not the standard, and that plaintiffs were still obligated to plead detailed facts in support of every element of their claims.  But that is not the law.  Briggs's reliance on cases that were decided long after the pleading stage, and that do not purport to discuss what is required to survive a motion to dismiss,

underscores the inconsistency between Briggs's positions and the liberal pleading requirements under the Federal Rules.  Kohler's counterclaims provide Briggs with sufficient notice of its claims for pleading purposes.

Briggs's attacks on Kohler's state law claims are similarly flawed.  Not only are Kohler's allegations sufficient to provide notice of its claims, but because Wisconsin law follows federal law, Kohler's counterclaims necessarily state valid claims under Wisconsin law for the same reasons they state valid claims under the Sherman Act.

Briggs moves in the alternative to "sever" Kohler's counterclaims pursuant to Fed. R. Civ. P. 21 and to have them "proceed as a wholly separate case[.]"  Memorandum in Support of Motion to Dismiss Kohler's Antitrust Counterclaims or in the Alternative for Severance of those Claims ["Mem."] at 1, 21.  This request should also be denied in its entirety.  Nearly all of Briggs's specific concerns — delay in the start of the patent trial, increased complexity of trial, juror confusion — may be avoided through separation of the patent and antitrust trials pursuant to Fed. R. Civ. P. 42(b), a measure that Kohler does not oppose.  Indeed, Briggs mischaracterizes many of its key cases as "severance" cases, when in fact they involved nothing more than trial bifurcation under Rule 42(b).  Briggs concedes that it is attempting to steer the antitrust claims to the Seventh Circuit and away from the Federal Circuit, and declares that "[t]his is as it should be."  Mem. at 24.  Not so.  Briggs's attempt to escape the Federal Circuit's appellate reach violates the governing jurisdictional statutes, is squarely at odds with a generation of both Federal Circuit and Seventh Circuit precedent, and is blatant forum shopping.

For all of these reasons, and as discussed more fully below, this Court should deny Briggs's motion to dismiss in its entirety and also deny its motion to sever Kohler's antitrust claims from the patent claims.

## II.     FACTUAL BACKGROUND

This action began as a patent infringement suit brought by Briggs against Kohler. Briggs's complaint alleges that Kohler manufactures and sells single cylinder internal

combustion engines that infringe Briggs's patent for an invention entitled "balancing system using reciprocating counterbalance weight." Complaint ¶¶ 6, 10. Briggs also alleges that Kohler manufactures and sells single cylinder internal combustion engines that infringe its patent for an invention entitled "engine cylinder head assembly." Complaint ¶¶ 7, 13.

Kohler answered by denying the principal allegations in Briggs's complaint. Kohler also alleged that the patents themselves are invalid and void, and that Kohler has not infringed any valid claim of either patent. Answer ¶¶ 15, 16. Kohler further asserted two counterclaims (one for each of the patents) under the Declaratory Judgment Act. Counterclaim ¶¶ 1, 2.

Kohler subsequently amended its Counterclaim to add the antitrust claims that are the subject of this motion. The new third and fourth counterclaims arise under Section 2 and Section 1 of the Sherman Act, respectively. First Amended Counterclaim (hereinafter, "Counterclaim") ¶¶ 2, 18-30. The fifth counterclaim arises under the antitrust laws of the State of Wisconsin and the sixth counterclaim alleges unfair competition under Wisconsin common law. *Id.* ¶¶ 3, 31-40. All of the claims that are the subject of this motion relate to the same factual circumstances.

Briggs and Kohler are competitors in the market for the manufacture and sale in the United States of engines used in consumer lawn tractors (the "relevant market"). *Id.* ¶ 19. Briggs has monopoly power in this market. *Id.* ¶ 20. Its monopoly power is evidenced both by its large market share and the fact that there are significant barriers to entry in the market. *Id.* Briggs and Kohler sell lawn tractor engines directly to original equipment manufacturers ("OEMs"), who make and assemble the tractors. *See id.* ¶ 21. The OEMs sell the completed tractors to a variety of retailers, with sales increasingly dominated by large national stores such as Lowe's, Home Depot, Sears and Wal-Mart. Large retailers often decide, or at least influence, which engines are used in lawn tractors sold in their stores.

Briggs is the dominant producer of engines not only for the consumer lawn tractor market, but also for the consumer walk-behind mower market. To maintain and increase its dominant position in the relevant market, Briggs began offering OEMs and retailers large sums

of money in the form of bundled rebates for the purchase of lawn mowers and tractors containing Briggs's engines.  *Id.* ¶ 21.  The bundled rebates cover multiple products in both markets. Competitors such as Kohler that do not make the same wide range of engines as Briggs are unable to match these bundled rebates.  *See id.* ¶¶ 22, 25.  Briggs also has entered into contracts and other arrangements with OEMs and retailers to deal exclusively with Briggs, and not with Kohler or other competitors.  *Id.* ¶ 21.  The bundled rebates and exclusive dealing arrangements have caused Kohler to lose sales and market share and will continue to do so if Briggs's conduct is allowed to persist.  *Id.* ¶¶ 25, 26.  Briggs's exclusionary conduct also harms consumers by reducing competition in the relevant market, which leads to higher prices and reduced choice. *Id.* ¶¶ 24, 26.

As we demonstrate below, these allegations are sufficient to state a claim for violations of the Sherman Act, Wisconsin's antitrust laws, and Wisconsin's common law.

## III.   ARGUMENT

### A.  Briggs Misconstrues the Applicable Pleading Requirements.

Under Rule 8, Kohler's counterclaims need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint may not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 972 (7th Cir. 1995).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

These principles apply with renewed force to motions to dismiss antitrust claims.  *See, e.g.*, *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994); *MCM Partners*, 62 F.3d at 972.  In fact, "dismissals prior to giving the [antitrust claimant] ample

opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976); *In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1047 (W.D. Wis. 2000). In antitrust cases, a plaintiff does not need to allege "facts that, if true, establish each element of a 'cause of action.'" *Sanjuan*, 40 F.3d at 251; *Krist Oil Co., Inc. v. Bernick's Pepsi-Cola of Duluth, Inc.*, 354 F. Supp. 2d 852, 855 (W.D. Wis. 2005) ("Notice pleading does not require a plaintiff to plead facts supporting each element of a cause of action."). Rather, all that is required is that the antitrust plaintiff "provide the defendant with minimal notice of the claim . . . ." *In re Copper*, 98 F. Supp. 2d at 1047. If the conduct alleged is consistent with the plaintiff's antitrust theory, "no more is required at this stage." *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir. 1994); *Sanjuan*, 40 F.3d at 251 ("At this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.").

Despite this recent authority, Briggs advocates a more rigorous pleading standard, relying principally on two cases. *See* Mem. at 4-6. First, Briggs cites *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984), for the proposition that, in order to survive a motion to dismiss, Kohler's counterclaim must contain "allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Mem. at 5 (quoting *Car Carriers*). To the extent *Car Carriers* can be read to require a plaintiff to plead facts in support of every element of its claims, it is no longer good law. Decisions such as *Car Carriers* that purport to impose heightened pleading requirements in antitrust cases were "scotched by the Supreme Court" in *Leatherman v. Tarrant County Narcotics & Coordination Unit*, 507 U.S. 163 (1993), in which a unanimous Court reaffirmed that basic notice pleading is all that is required. *See Hammes*, 33 F.3d at 778; *MCM Partners*, 62 F.3d at 976; *Rozema v. Marshfield Clinic*, Nos. 96-C-592-C, 96-C-916-C, 96-C-730-C, 1997 WL 416292, at *6 (W.D. Wis. Mar. 10, 1997) (citing *Car Carriers*).

Second, the Supreme Court's recent decision in *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627 (2005), cannot be read, as Briggs argues, to change the pleading requirements in antitrust

cases.  *See* Mem. at 5-6.  Rather, after affirming the continued viability of the basic notice

pleading standard discussed above, the Court in *Dura* held that, in a suit by a private plaintiff

claiming securities fraud, the plaintiff must plead facts concerning the cause of the loss in order

to provide the defendant with adequate notice of the type of claim it alleges.  125 S. Ct. at 1634

(noting that the complaint did not provide "the defendants with notice of what the relevant

economic loss might be or of what the causal connection might be between that loss and the

misrepresentation").  The Court's holding reflects the fact that the Private Securities Litigation

Reform Act of 1995 expressly imposes on plaintiffs the burden of proving that the defendant's

misrepresentations "caused the loss for which the plaintiff seeks to recover."  *Id.* at 1633

(quoting Private Securities Litigation Reform Act of 1995, § 78u-4(b)(4)).[1]  This holding has no

relevance here, where the Sherman and Clayton Acts do not enumerate any specific facts that

must be proven and Kohler's counterclaims already provide Briggs with notice of the legal

theory that Kohler plans to pursue.

Kohler's antitrust claims clearly satisfy applicable pleading standards.

**B.      Kohler Has Standing as a Competitor To Assert Claims for Unlawful
          Bundled Pricing and Exclusive Dealing.**

Antitrust standing is an essential ingredient in any private antitrust action.  To have

standing, a private plaintiff must show, among other things, that the injury it suffered constitutes

"antitrust injury," which is defined as the kind of injury the antitrust laws were intended to

prevent and "that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v.*

*Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Briggs not only argues that Kohler has

---

[1] Furthermore, in requiring securities fraud plaintiffs to allege facts supporting economic loss and "loss causation," the Court relied heavily on the fact that the statutory scheme "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."  *See* 125 S. Ct. at 1633; *see also id.* at 1634 (allowing a plaintiff to proceed without alleging loss causation "would bring about harm of the very sort the statutes seek to avoid").  There is no comparable statutory scheme in antitrust law.

failed to plead the requisite antitrust injury to have standing to challenge Briggs's conduct, it goes so far as to suggest that competitors rarely have standing to challenge actions of their business rivals.  In making this argument, Briggs ignores decades of antitrust jurisprudence recognizing not only that competitors have standing to sue for conduct that harms the competitive process, but also that in some circumstances they may be in the best position to bring such claims.

Briggs's repeated refrain that "[l]ost business is not antitrust injury" disregards the nature of Kohler's claims here.  *See* Mem. at 7-8.  While Kohler agrees that the antitrust laws should not be used to insulate a firm from aggressive competition from its rivals and that a firm may not sue based on the mere fact that it lost business to a competitor, that is not Kohler's claim. Rather, Kohler alleges that it has lost, and will continue to lose, business to Briggs as a result of the unlawful bundled rebates and exclusive dealing.  As Kohler and Briggs's other competitors continue to lose market share, they will be weakened to the point that they no longer can provide a competitive check on Briggs.  Then, Briggs will be in a position to raise prices and deprive consumers of competitors' products.  *See* Counterclaim ¶¶ 24-26.

Given these allegations, the cases that Briggs cites discussing "competition for the contract" and "lost business" (*see* Mem. at 8-9), while correctly decided, are inapposite.  Kohler is not complaining that it lost business due to intense, but legal, "competition for the contract" with Briggs.  Rather, Kohler's counterclaims allege that it is unable to compete on the merits of its products because Briggs is using its monopoly power in the relevant market, combined with its dominant position in consumer walk-behind lawn mower engines, to offer bundled rebates and exclusive dealing arrangements that Kohler is unable to match.

Briggs's further emphasis on the fact that Kohler "remains in the engine manufacturer market" is equally misplaced.  *See*, *e.g.*, *id.* at 1, 3, 11.  It is black letter law that competitors have standing to bring many types of antitrust claims and that they do not need to have been forced out of the market before they can do so.  Standing is especially clear, as the leading antitrust treatise explains, "when the plaintiff alleges that its rival engaged in an exclusionary

practice designed to rid the market of the plaintiff or to preclude its entry, so that the defendant could maintain or create a monopoly."  2 Phillip E. Areeda et al., *Antitrust Law* ¶ 348d1, at 392 (2d ed. 2000).  If the defendant's exclusionary scheme has not yet succeeded such that it can charge consumers higher prices, the injured rival is the most likely plaintiff, not, as Briggs puts it, "a poor champion of consumers" (Mem. at 8).  *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-23 (1993) (describing standards for when a competitor may sue for predatory pricing, including prior to the post-predation period).  In fact, if injured competitors were not able to challenge unsuccessful, or not yet successful, predation, "no one can — a result correctly resisted by the courts."  2 Areeda, *supra*, ¶ 348d1, at 393 ("[A]lthough the potential for consumer injury makes conduct illegal, the injury to a competitor appears earlier.").

These principles apply to the claims alleged here.  It is undisputed that the harm to competitors caused by exclusionary bundled rebates constitutes antitrust injury.  In fact, the great majority of cases challenging bundled pricing programs have been brought by rivals.  *See LePage's*, 324 F.3d 141 (affirming Section 2 verdict against monopolist competitor who offered bundled rebates and engaged in exclusive dealing); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) (affirming judgment for competitor who alleged that drug manufacturer's practice of providing discounts to hospitals based on the hospitals' purchase of three different antibiotics violated Section 2); *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455 (S.D.N.Y. 1996) (no question of competitor's standing to bring claim alleging unlawful bundled rebates).  It is equally clear that a competitor has standing to sue for another competitor's unlawful exclusive dealing practices.  *See Minn. Mining and Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1145-47 (D. Minn. 1999) (denying defendant's motion for summary judgment on competitor's Section 2 exclusive dealing claim); 2 Areeda, *supra*, ¶ 348f4, at 407 ("When the defendant manufacturer sells to customers who promise to buy exclusively from it, the rival manufacturer plaintiff clearly has standing to sue."); *cf. Roland*

8

*Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (suggesting excluded competitor would be the logical plaintiff).

The Third Circuit's *en banc* decision in *LePage's* demonstrates why Briggs's antitrust injury standing argument is incorrect.  There, the Third Circuit explained how 3M's bundled rebates and exclusive dealing practices could lead to harm to competition, not just harm to a competitor like LePage's:

> When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e., predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.  It has been recognized . . . that even the foreclosure of "one significant competitor" from the market may lead to higher prices and reduced output.

324 F.3d at 159 (citing *Roland*, 749 F.2d at 394); *see also id*. at 155 (explaining how bundled rebates harm competition).  Kohler's antitrust injury allegations fit the *LePage's* paradigm.

Kohler's allegations that it was harmed and will continue to be harmed by Briggs's unlawful bundled rebates and exclusive dealing, and that consumers are or will be harmed as well, are sufficient to establish antitrust injury and standing for pleading purposes.

### C.  Kohler Has Stated a Claim Under Section Two of the Sherman Act.

Section 2 claims come in many varieties, but they all share two common elements:  (1) the possession of monopoly power in a relevant market and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).  Kohler has sufficiently pled both of these elements.

### 1.  Kohler Has Alleged that Briggs Has Monopoly Power.

Kohler alleges that Briggs has monopoly power in the market for the manufacture and sale in the United States of engines used in consumer lawn tractors.  Counterclaim ¶¶ 19-20.

Briggs does not dispute that Kohler has adequately pled a relevant market, but argues that "Kohler's summary allegation that Briggs has monopoly power is a legal conclusion that should not be accepted as true on a motion to dismiss." Mem. at 9. Briggs misconstrues Kohler's obligations at the pleading stage.

Monopoly power is the power to raise prices above competitive levels or reduce output. *See, e.g., Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986). Monopoly power is difficult to prove directly, and courts often rely on evidence of market share and barriers to entry (among other possibly relevant facts) to determine whether the defendant has monopoly power. *See, e.g., United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001). Although *proof* of monopoly may be complex, there are no particular facts or "magic words" that a plaintiff must allege to *plead* monopoly power. *See, e.g., Sanjuan*, 40 F.3d at 251; *Rozema*, 1997 WL 416292, at *7 ("a plaintiff need not plead facts and may plead conclusions").

For purposes of providing notice, it is sufficient that Kohler has alleged a clearly defined relevant market — which Briggs does not dispute — and the fact that Briggs has monopoly power in that market. Of course, Kohler did not stop there. It also alleged that Briggs's share of the market and the significant barriers to entry that exist, "including the investment, technology, and business reputation necessary to manufacture and market the products," demonstrate Briggs's monopoly power. Counterclaim ¶ 20. Furthermore, Kohler has alleged that Briggs has the power to affect prices and the availability of products in the market. *Id.* ¶ 24. Nothing more is required.[2]

---

[2] Briggs quibbles with Kohler's failure to allege specific market shares. Certainly Briggs has ready access to that information itself, and Kohler's allegations are more than sufficient to put Briggs on notice of its claims. In any event, Kohler believes that Briggs controls approximately 69% of the relevant market. Furthermore, Briggs has long enjoyed a dominant share of the market. *See Kohler Co. v. Briggs & Stratton Corp.*, No. 85-C-1042, 1986 WL 946, at *1 (E.D. Wis. Mar. 13, 1986).

### 2.   Kohler Has Pled Exclusionary Conduct by Briggs.

Briggs also argues that Kohler has not alleged "predatory" or "exclusionary" conduct by Briggs — the second element of a Section 2 monopolization claim.  The Supreme Court has defined "predatory" or "exclusionary" conduct as behavior "that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (quoting 3 P. Areeda & D. Turner, *Antitrust Law* 78 (1978)).  Put otherwise, "[i]f a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."  *Id.* at 605 (quoting Robert Bork, *The Antitrust Paradox* 138 (1978)).

Kohler has sufficiently pled predatory conduct by Briggs.

### a.   Section Two Claims Are Not Confined to Narrow Categories of Conduct.

As the definition of "predatory" or "exclusionary" conduct suggests, it is difficult to define or anticipate all of the different types of conduct that might violate Section 2.  *See, e.g., Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.").  This is especially true because, "[w]here a defendant maintains substantial market power, his activities are examined through a special lens:  Behavior that might otherwise not be of concern to the antitrust laws — or that might even be viewed as procompetitive — can take on exclusionary connotations when practiced by a monopolist."  *Eastman Kodak*, 504 U.S. at 488 (Scalia, J., dissenting).

For these reasons, a plaintiff need not rely on static definitions or categories of predatory or exclusionary conduct, but rather can "prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated."  *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 500 (1969)

(discussing a tying claim); *see also Eastman Kodak*, 504 U.S. at 467-68 ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.  This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'") (citation omitted).  Not surprisingly, there are many Section 2 cases that do not involve a "traditional" monopolization theory such as predatory pricing or a refusal to deal.  *See, e.g., LePage's*, 324 F.3d 141; *Microsoft*, 253 F.3d 34; *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540 (10th Cir. 1995).

Briggs asks this Court to dismiss Kohler's antitrust counterclaims for purportedly failing to allege the elements of any "recognized antitrust theory" or any "cognizable 'exclusionary practices.'"  Mem. at 9, 10.  But Kohler's only obligation at the pleading stage is to identify conduct that "impair[s] the opportunities of rivals" and "does not further competition on the merits."  *See Aspen Skiing*, 472 U.S. at 605 n.32.  Even Briggs acknowledges that "[c]ourts recognize the need to be flexible in order to ensure that novel types of exclusionary conduct do not escape condemnation . . . ."  Mem. at 14.[3]  Here, Kohler has not only alleged conduct that falls within the Supreme Court's definition of exclusionary conduct, it also has grounded its allegations in broadly accepted antitrust theories and viable antitrust claims.

---

[3] Briggs suggests that Kohler is trying to "cook up" a new type of Section 2 claim by combining unrelated elements of traditional antitrust theories.  *See* Mem. at 14.  This is incorrect for all of the reasons explained in the sections of this opposition brief that follow.  Moreover, monopolization claims are often based on a variety of conduct by the defendant that collectively gives rise to liability under Section 2.  *See, e.g., City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980) ("It is the mix of the various ingredients of [defendant's] behavior in a monopoly broth that produces the unsavory flavor."); *LePage's*, 324 F.3d at 162 ("the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation") (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").

**b.** **Kohler Has Properly Alleged a Section Two Claim Based on Unlawful Bundled Pricing.**

Kohler alleges that Briggs has offered its direct customers (OEMs) and retailers bundled rebates and other forms of discounts or payments that deprive Kohler and other competitors of the opportunity to compete on the merits of their respective products. *See* Counterclaim ¶¶ 21-23. Because Kohler and other competitors are unable to compete with these bundled rebates, Briggs is able to maintain and increase its monopoly power to the detriment not only of competitors, but also of consumers who have suffered or will suffer from higher prices and/or fewer product options. *See id.* ¶¶ 24-26.

"Bundled pricing," "bundled rebates," or "bundled discounts" refer to payments, discounts, or other pricing-related inducements that are based on purchases not just of a single product, but of products in more than one market or market segment. Such pricing practices are harmful when engaged in by dominant firms because "they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." *LePage's*, 324 F.3d at 155. In *LePage's*, the Third Circuit sitting *en banc* affirmed a jury verdict finding that 3M's bundled rebate programs violated Section 2. *Id.* at 157. As with Briggs's bundled pricing here, 3M's pricing practices were found to have made it impossible for a smaller competitor to compete on the merits of its products alone. Instead, even if the buyer wanted to do business with the smaller competitor, it would have had to pay a penalty to do so, in the form of the large discount covering multiple products that it would be forced to forgo. *See id.* at 160-61.

We are mystified by Briggs's failure to discuss Kohler's bundled rebate claim directly and by its decision to relegate *LePage's* to a footnote. *See* Mem. at 12-13 n.7. Although one would never know it from reading Briggs's motion, bundled pricing by a monopolist has been accepted by many courts as a potential violation of Section 2. *See SmithKline*, 575 F.2d at 1065 (holding bundled discounts violate Section 2); *Ortho*, 920 F. Supp. at 469 (describing circumstances under which bundled discounts violate Section 2); *Avery Dennison Corp. v. Acco*

13

*Brands, Inc.*, No. CV99-1877DT (MCX), 2000 WL 986995, at *19-20 (C.D. Cal. Feb. 22, 2000) (denying counterclaim defendant's motion for summary judgment on Section 2 claim involving allegations that defendant, among other things, offered bundled rebates); *McKenzie-Willamette Hosp. v. PeaceHealth*, No. Civ. 02-6032-HA, 2004 WL 3168282, at *4 (D. Or. Oct. 22, 2004) (citing *LePage's* with approval and discussing evidence of bundled discounts that supported Section 2 verdict).[4]

Briggs's sole response to this is that *LePage's* is "inapposite" and "not the law in this Circuit." *See* Mem. at 12 n.7.[5] But the Seventh Circuit has never decided a bundled pricing case, and there are no decisions in this circuit that foreclose the possibility of such a claim.[6] Given the widespread acceptance of bundled pricing as a viable Section 2 theory, Briggs needs something more than a *lack* of law on point in the Seventh Circuit to argue that allegations of exclusionary bundled pricing do not state a claim.

Although it all but ignores Kohler's actual claim of unlawful bundled rebates, Briggs devotes an entire section of its motion to the argument that Kohler has not stated "a valid

---

[4] In addition, the Areeda treatise discusses *LePage's* with approval and describes the potential harm to competition from bundled pricing practices. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 749 (2004 Supp.).

[5] In its discussion of Kohler's Section 1 claim, Briggs also argues that Kohler never identifies "exactly what Briggs has 'bundled.'" *See* Mem. at 17. Although Kohler believes that its allegations are sufficient to put Briggs on notice of the nature of its claims, particularly since bundled pricing is a well-known legal theory, Briggs's conduct includes rebates or offers contingent upon purchases of not only consumer lawn tractor engines, but also of engines for consumer walk-behind lawn mowers, a different market in which Briggs also has a dominant share. Since Kohler does not manufacture engines for the consumer walk-behind engine market (or all segments within the consumer lawn tractor market), it is unable to match Briggs's bundled discounts.

[6] Contrary to Briggs's suggestion (Mem. at 12-13 n.7), nothing in the Seventh Circuit's decision in *Roland* is contrary to *LePage's*. There was no issue of bundled rebates in *Roland*. Instead, *Roland* was an exclusive dealing case in which the defendant manufacturer had a small share of a market in which exclusive dealing by competing manufacturers was the norm. 749 F.2d at 382, 394.

predatory pricing claim." *See* Mem. at 13. But Kohler has not tried to allege a predatory pricing claim, and it has no obligation to do so. Briggs's point appears to be that Kohler cannot state a legally valid, or economically plausible, claim for unlawful *bundled* pricing without pleading below-cost pricing as is required for predatory pricing claims under *Brooke Group*. *See* Mem. at 1, 8, 14-15.

Briggs is wrong. Liability for bundled rebates (not to mention exclusive dealing, which we discuss in the next section) does not turn on whether the prices were below cost. Above-cost prices may foreclose competitors when dominant firms offer discounts that encompass multiple products.[7] Addressing 3M's argument that its bundled rebates were lawful so long as none of the prices were below its costs, the Third Circuit in *LePage's* unequivocally held that nothing in *Brooke Group* "dilutes the Court's consistent holdings that a monopolist will be found to violate § 2 of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification." *LePage's*, 324 F.3d at 151-52; *see also Ortho*, 920 F. Supp. at 469 ("the fact that Abbott has priced each component of its package above average variable cost is not alone sufficient to protect it from Section 2 liability"). In fact, no court has held that liability for bundled discounts under Section 2 requires that the discounted prices be below the defendant's costs.

---

[7] Throughout its brief, Briggs attempts to mischaracterize Kohler's claims by arguing that Kohler is just complaining about "aggressive" but above-cost discounts that benefit consumers. *See, e.g.*, Mem. at 1, 8. As the discussion in text indicates, it is the structure of bundled discounts that distinguish them from low but non-predatory price cuts and volume discounts on single products, which do not give rise to a potential claim under Section 2. *See LePage's*, 324 F.3d at 154 (distinguishing bundled rebates from "volume rebates which are concededly legal and often reflect cost savings"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000) (distinguishing bundled rebates from lawful volume discounts on single products); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1203 (3d Cir. 1995) (distinguishing the single product volume discounts at issue from unlawful bundled discounts); *cf. W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) (simple volume discounts are the not the equivalent of exclusive dealing and "are legal under the antitrust laws"). Moreover, there is no reason to believe that consumers benefit from bundled rebates even in the short run. *See LePage's*, 324 F.3d at 163 ("'the record amply reflects that 3M's rebate programs did not benefit the ultimate consumer'") (citation omitted).

15

Kohler's allegations that Briggs engaged in unlawful bundled rebates state a claim under Section 2 of the Sherman Act.

> ### c.   Kohler Has Properly Alleged a Section Two Claim Based on Unlawful Exclusive Dealing.

Kohler has also pled a violation of Section 2 based on unlawful exclusive dealing, a claim that, unlike bundled pricing, Briggs's motion does address.  However, Briggs's discussion of Kohler's exclusive dealing claim suffers from two critical flaws:  (1) it ignores the cases discussing Section 2 exclusive dealing claims; and (2) it relies on inapposite authorities, which either do not involve claims against monopolists or have nothing to do with pleading requirements.

Exclusive dealing has traditionally been a claim brought under Section 3 of the Clayton Act or, alternatively, Section 1 of the Sherman Act.  In the most recent Supreme Court case addressing an exclusive dealing claim, the Court held that exclusive dealing is unlawful only if it "foreclose[s] competition in a substantial share of the line of commerce affected."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (construing Clayton Act Section 3). Exclusive dealing can also constitute a violation of Section 2,[8] and courts increasingly have come to understand that the traditional benchmarks used to determine liability for exclusive dealing in the Section 1 or Clayton Act Section 3 context may not apply in cases involving a monopolist's exclusive dealing practices.  In particular, in *Microsoft*, the D.C. Circuit held that Microsoft's exclusive dealing practices violated Section 2 even though they did not meet the standard liability thresholds the court would normally apply to exclusive dealing by a non-

---

[8] As a general matter, conduct that violates Section 1 also will violate Section 2 if engaged in by a monopolist.  *United States v. Griffith*, 334 U.S. 100, 106 (1948) ("For those things which are condemned under § 2 are in large measure merely the end products of conduct which violates § 1.").  In *Tampa Electric*, there were claims under Sections 1 and 2 of the Sherman Act as well as Clayton Act Section 3, but the Court did not need to focus on the foreclosure analysis under Section 2 as the defendant controlled less than one percent of the relevant market.  365 U.S. at 333, 335.

monopolist under Section 1.  253 F.3d at 70-71 (asking whether exclusive deals, however small, had a "significant effect in preserving [Microsoft's] monopoly"); *see also id.* at 72 (exclusive deals with a "relatively small channel for browser distribution" were unlawful under Section 2); *id.* at 73 (exclusive deal with Apple, which had approximately 15 percent of the market, was unlawful under Section 2).  Other courts also have concluded that the legality of exclusive dealing by a monopolist cannot be determined by adherence to rigid rules.  In *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 195 (3d Cir. 2005), the Third Circuit recently held that the fact that the exclusive deals at issue were non-binding and terminable at will was meaningless if "the rivals simply could not provide dealers with a comparable economic incentive to switch."  Instead of presuming that short term or non-binding contracts cannot foreclose rivals, the proper analysis is to ask whether the conduct effectively excludes rivals.  *Id.* at 193-94; *see also LePage's*, 324 F.3d at 157-59 (discussing express and *de facto* exclusive dealing arrangements similar to those alleged here); *Appleton Papers*, 35 F. Supp. 2d at 1145 (Section 2 exclusive dealing analysis is different than traditional Section 1 analysis); *cf. Tampa Elec.*, 365 U.S. at 327-28 (one of the factors relevant to whether there is substantial foreclosure from exclusive dealing is "the relative strength of the parties").

Briggs ignores these recent holdings when it argues that Kohler cannot state a claim for exclusive dealing under Section 2 without alleging the specific degree of foreclosure or the duration of the exclusive dealing contracts.  *See* Mem. at 3, 10-11.  Briggs relies primarily on three decisions for this proposition:  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1997), and *Roland*, 749 F.2d 380.  Not surprisingly, none of these cases involved claims under Section 2 or defendants with market power.  *See Jefferson Parish*, 466 U.S. at 26-27 (in case principally about tying under Section 1, finding defendant lacked market power); *Paddock*, 103 F.3d at 44-45 (Section 1 case; "market is competitive"); *Roland*, 749 F.2d at 381-82 (Clayton Act Section 3 case; defendant had 16-17 percent of market).  What is more, only *Paddock* involved a motion to dismiss and, in that case, it was clear from the facts alleged that the plaintiff could not prove

17

unlawful exclusive dealing. *See* 103 F.3d at 44-45 (market was highly competitive; no defendant had market power; and plaintiff acknowledged that the defendants acted independently).

Briggs's reliance on the Eighth Circuit's decision in *Concord Boat* is equally misplaced. *See* Mem. at 12. First, *Concord Boat* has nothing to do with pleading requirements; the case had already proceeded to trial and verdict. 207 F.3d at 1043-44. Second, although the Eighth Circuit held that the non-bundled discounts at issue there did not amount to *de facto* exclusive dealing because customers continued to buy from competitors, *id.* at 1059, nothing in the opinion suggests that *de facto* exclusive dealing, such as in the form of bundled rebate programs, cannot state a claim under either Section 1 or Section 2.[9]  To the contrary, the court specifically distinguished the lawful discounts at issue in *Concord Boat* from the type of rebate program alleged here. *See id.* at 1062 (distinguishing *LePage's* and other bundled pricing cases because "only one product . . . is at issue here and there are no allegations of tying or bundling with another product").

In short, Briggs has not pointed to any authority requiring Kohler to plead the duration of the exclusive dealing arrangements at issue or the specific amount of the market foreclosed by those arrangements in order to state a claim for exclusive dealing under Section 2.  Kohler's allegations provide adequate notice of its claim that Briggs engaged in exclusive dealing conduct with OEMs and retailers in violation of Section 2. *See* Counterclaim ¶ 21.  This is all that Rule 8 requires.

---

[9] *De facto* exclusive dealing refers to practices that, as Kohler alleges in its counterclaim, "effectively require" buyers to deal exclusively with the supplier. *See* Counterclaim ¶ 21.  The law does not distinguish between contractual exclusivity and agreements or conduct that, for all practical purposes, "effectively require" exclusivity. *See, e.g., Tampa Elec.*, 365 U.S. at 324 (requirements contract had same practical effect as express exclusivity provision); *LePage's*, 324 F.3d at 157 (test is not express exclusivity, but whether conduct "effectively foreclosed the business of competitors").

**D.  Kohler Has Stated a Claim Under Section One of the Sherman Act.**

Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade.  *See, e.g.*, *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).  Here, Kohler has alleged that Briggs's exclusive dealing agreements and bundled rebate programs entered into with retailers and OEMs are unreasonable restraints of trade in violation of Section 1.  Counterclaim ¶¶ 28-30.  These allegations are sufficient to state a claim under Section 1.

Briggs does not challenge the sufficiency of Kohler's allegations of concerted action for Section 1 purposes.  *See* Mem. at 15-16.  Rather, Briggs argues that "Kohler does not assert that there is illegal price-fixing or market allocation occurring that violates Section 1."  *Id.*  This assertion, while true, is beside the point.  Price fixing and market allocation agreements are not the only types of conduct that violate Section 1.  Section 1, like Section 2, is a flexible statute that potentially prohibits a wide range of conduct.  *See, e.g., Fortner*, 394 U.S. at 500; *Eastman Kodak*, 504 U.S. at 467-68.  For pleading purposes, Kohler needs only to allege conduct that if proven could constitute an unreasonable restraint of trade.  Both of Kohler's claims here, for unlawful bundled rebates and exclusive dealing, are valid claims under Section 1.

First, bundled rebate programs are potential violations of Section 1 as well as Section 2.  For example, *LePage's* involved a claim that 3M's bundled rebate programs violated Section 1 and Section 2.  Although the jury concluded that the rebates did not violate Section 1, there was no question about whether the allegations were sufficient for pleading purposes to state a claim under both sections.  *See* 324 F.3d at 145; *see also LePage's Inc. v. 3M*, No. Civ. A 97-3983, 1997 WL 734005, at *7 (E.D. Pa. Nov. 14, 1997) (trial court denying motion to dismiss Section 1 exclusive dealing claim).  Kohler has alleged that Briggs entered into agreements with OEMs and retailers to provide bundled rebates that excluded competitors such as Kohler.  This is sufficient to state a claim under Section 1 as well as Section 2.[10]

_____

[10] Once again, Briggs tries to confuse the issue by pointing out Kohler's failure to plead the elements of a claim that Kohler does not purport to bring — here, tying.  *See* Mem. at 16-17.
*(Footnote continued)*

Second, Briggs does not dispute that exclusive dealing is a traditional Section 1 claim, but argues that Kohler fails to allege substantial foreclosure, including the specific percentage of the market from which it is excluded, or the existence of contractual terms that prevent Kohler from bidding for the customer's business after some reasonable amount of time. *See* Mem. at 3, 10-11, 16. In discussing Kohler's exclusive dealing claim under Section 2, we explained that courts do not adhere to rigid rules in determining liability for exclusive dealing by a monopolist. In terms of *pleading*, Briggs's insistence that Kohler allege the details of the exclusive dealing arrangements in order to state a claim is wrong under both Section 1 and Section 2.

Rather, it is sufficient that Kohler has alleged substantial foreclosure (albeit without using those exact words). *See* ¶¶ 28-30. Kohler has no obligation to allege the precise amount of the market foreclosed or the length or other specific terms of any exclusive arrangements. Such pleading requirements would be contrary to Rule 8, because that type of information is typically in the defendant's possession, not the plaintiffs, and does not need to be alleged to provide the defendant with adequate notice of the claim. *See Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 65-66 (S.D.N.Y. 1994) (plaintiff not required to describe details of exclusive contracts to state claim); *see also Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003) (reversing dismissal of exclusive dealing claim, noting that whether the arrangements were anticompetitive was "a factual matter that — given the allegations — can hardly be resolved on the face of the complaint"); *Ford v. Cascade Health Serv.*, No. Civ. 03-6256-TC, 2004 WL 1445523, at *4 (D. Or. June 25, 2004) (denying motion to dismiss exclusive dealing claim, stating that given "the early stage of this proceeding and the limited amount of discovery that has yet taken place, the fact that plaintiff's complaint does not describe in detail . . . the specific effect on competition that the alleged exclusive dealing arrangement had should

---

A bundled pricing claim is distinct from a tying claim. *Cf. LePage's*, 324 F.3d at 155 (noting that harm from bundled rebates is similar to tying, but discussing tying and bundled rebates as distinct claims). Kohler does not need to plead the elements of a tying claim to state a Section 1 claim based on bundled pricing.

not preclude him from proceeding with his claim"), *adopted by* 2004 WL 1557402 (D. Or. July 9, 2004).[11]

Furthermore, imposing rigid pleading requirements to allege a claim for exclusive dealing would be contrary to the flexible standard used to determine liability for such conduct. As Justice O'Connor explained in an opinion cited by Briggs, "[i]n determining whether an exclusive-dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question — the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others." *Jefferson Parish*, 466 U.S. at 45 (O'Connor, J., concurring); *see also Tampa Elec.*, 365 U.S. at 329 (discussing many factors to consider in determining whether exclusive dealing is unlawful). As one court stated, "[e]valuating all of these factors [discussed in *Tampa Electric*] requires a factual inquiry that is inappropriate on the face of the complaint." *Virgin Atl.*, 872 F. Supp. at 66.

Kohler's allegations are sufficient to plead an exclusive dealing claim under Section 1.

### E.  Kohler Has Stated a Claim Under Wisconsin Antitrust Law.

Kohler's fifth counterclaim alleges violations of Wis. Stat. §§ 133.03, 133.04 and 133.05 based on the same bundled rebates and exclusive dealing conduct that provides the basis for Kohler's Sherman Act claims.[12]  Briggs argues that Kohler's claim under Wis. Stat. § 133.03 fails because that statute "follows federal law."  *See* Mem. at 18.  Kohler agrees that "Wisconsin

---

[11] Nor can *Paddock* be read to impose any particular pleading requirements. The case analyzes whether the detailed facts before the court could constitute a violation of the antitrust laws as a matter of law, not what minimum facts need to be alleged to state a claim in the first instance. *See* 103 F.3d at 43-45.

[12] In addition, Kohler's fifth counterclaim is based on Wis. Stat. §§ 133.14 and 133.18, which provide two different remedies that may be available if Kohler prevails on its claim pursuant to §§ 133.03, 133.04, or 133.05. *See, e.g., Conley Publ'g Group Ltd. v. Journal Communications, Inc.*, 2003 WI 119, ¶ 15, 265 Wis. 2d 128, 139, 665 N.W.2d 879, 885 (2003); *Rozema*, 1997 WL 416292, at *11.

courts have followed federal court interpretations of Sections 1 and 2 of the Sherman Act and have construed Wisconsin antitrust statutes in conformity with these federal court interpretations." *Conley Publ'g Group Ltd. v. Journal Communications, Inc.*, 2003 WI 119, ¶ 17, 265 Wis. 2d 128, 140, 665 N.W.2d 879, 885 (2003). Thus, because Kohler has adequately pled a claim under the Sherman Act, it also has satisfied the pleading requirements for § 133.03 (Wisconsin's analog of the Sherman Act), and that should be the end of the matter.

To avoid this seemingly obvious result, Briggs asserts that the Wisconsin Supreme Court in *Conley* rejected a claim for bundled pricing like Kohler's claim here. *See* Mem. at 19. Briggs is wrong. *Conley* was a predatory pricing case. 2003 WI 119, ¶ 1, 265 Wis. 2d at 133, 665 N.W.2d at 882. The Wisconsin Supreme Court held only that the federal standards for predatory pricing claims set forth in *Brooke Group* also apply to predatory pricing claims brought under § 133.03. 2003 WI 119, ¶ 33, 265 Wis. 2d at 154, 665 N.W.2d at 892. The court in *Conley* did not address the validity of a bundled rebate claim since no such claim was before it; nor did it suggest that *Brooke Group* would apply to such claims. In fact, the Wisconsin Supreme Court expressly distinguished *LePage's* as a case that does not "directly involve predatory pricing" and therefore was not relevant to the court's decision. 2003 WI 119, ¶ 32 n.20, 265 Wis. 2d at 153 n.20, 665 N.W.2d at 893 n.20.

Turning next to Wis. Stat. §§ 133.04 and 133.05, which prohibit price discrimination and secret rebates, respectively, Briggs argues that these claims fail because, under *Conley*, Kohler cannot assert a claim without alleging below-cost pricing and a reasonable prospect of recoupment, under the rule set forth in *Brooke Group*. *See* Mem. at 19-20; *Brooke Group*, 509 U.S. at 222-24 (discussing standards for proving a primary line violation of § 2(a) of the Robinson-Patman Act and a predatory pricing claim under Section 2 of the Sherman Act). Once again, Briggs has misinterpreted the breadth of the holding in *Conley*. Specifically, the Wisconsin Supreme Court in *Conley* never discussed whether the requirements of *Brooke Group*

22

apply to "primary line" claims[13] under §§ 133.04 and 133.05; it only addressed Wisconsin's Sherman Act counterpart, § 133.03.  *See Conley*, 2003 WI 119, ¶ 17, ¶ 33, 265 Wis. 2d at 140, 154, 665 N.W.2d at 885, 892 (referring to Wisconsin courts following Sherman Act precedents; no mention of §§ 133.04 and 133.05).

Unlike § 133.03, which very closely resembles the language of the Sherman Act, there are significant differences between the language of §§ 133.04 and 133.05 and the corresponding sections of the federal Robinson-Patman Act, 15 U.S.C. §§13(a), (d) & (e).  For that reason, federal law has not been deemed to be controlling in interpreting §§ 133.04 and 133.05, especially where the issue presented implicates the unique language of the Wisconsin statutes. *See Obstetrical & Gynecological Assocs. of Neenah, S.C. v. Landig*, 129 Wis. 2d 362, 368, 384 N.W.2d 719, 722 (Ct. App. 1986) ("We are not obliged to follow federal precedent in the instant case.  The Robinson-Patman Act is not controlling given the differences in language between it and sec. 133.05, Stats."); *cf. Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 190 Wis. 2d 650, 665 n.18, 529 N.W.2d 905, 911 n.18 (1995) (acknowledging difference in statutes, but finding federal precedents persuasive because differences were not determinative of the issue in the case); *Tele-Port, Inc. v. Ameritech Mobile Communications, Inc.*, 2001 WI App. 261, ¶ 17, 248 Wis. 2d 846, 861-62, 637 N.W.2d 782, 790-91 (Ct. App. 2001) (construing meaning of specific terms in § 133.05 without mentioning federal law).

Section 133.05 prohibits the "secret payment or allowance of rebates, refunds, commissions or unearned discounts, whether in the form of money or otherwise, or the secret extension to certain purchasers of special services or privileges not extended to all purchasers . . . [that] tend[] to injure a competitor . . . ."  In *Landig*, the Wisconsin Court of Appeals held that to prevail under § 133.05 "it is not necessary to show intent to injure, but it is necessary to

---

[13] A "primary line" claim refers to a claim by a horizontal competitor at the supplier or manufacturer level, as opposed to a "secondary" (or further) level claim by a downstream firm. *See*, *e.g.*, *Brooke Group*, 509 U.S. at 222.

prove that the secret rebate had an effect upon a competitor or an effect upon competition." 129 Wis. 2d at 369, 384 N.W.2d at 723. The court made no mention of needing to satisfy the *Brooke Group* requirements. Furthermore, under the language of the statute itself, it is far from clear how a below-cost test would be applied. A firm might pay a large secret rebate at the end of the year based on many sales of different products throughout the year. How should the rebate be allocated to determine whether there were below-cost sales? The question becomes almost unanswerable where the case involves a claim about "the secret extension to certain purchasers of special services or privileges," which is also prohibited under § 133.05.

Nor is there any good reason to impose the *Brooke Group* requirements applicable to a Robinson-Patman Act claim on a primary line competitor claim under § 133.05. First, there are important differences in the language of the respective statutes. Sections 2(d) and (e) of the Robinson-Patman Act, the counterparts of § 133.05, make no reference to "rebates" or "special services or privileges." *See* 15 U.S.C. § 13(d) & (e). More important, they never refer to injury to "a competitor," as § 133.05 does. Second, *Brooke Group* itself involved a claim under § 2(a) of the Robinson-Patman Act, not §§ 2(d) or (e). *See Brooke Group*, 509 U.S. at 216-17. We are not aware of any case discussing the application of *Brooke Group* to primary line cases under §§ 2(d) or (e). Instead, the consensus of courts is that there is no statutory basis in the Robinson-Patman Act for such a primary line claim under §§ 2(d) and (e). *See* 14 Herbert Hovenkamp, *Antitrust Law* ¶ 2363c3, at 244 (1999). In contrast, § 133.05 clearly provides that primary line competitors such as Kohler can sue for violations. *See Landig*, 129 Wis. 2d at 370-72 & n.2, 384 N.W.2d at 723-24 & n.2 (holding that not only competitors, but also ultimate consumers, have standing to sue for violations of § 133.05; noting *amicus* Wisconsin Attorney General's position that competitors of either the seller or the recipient of the rebate should have standing to sue).[14]

---

[14] *Conley* itself originally included a primary line claim under § 133.05. The circuit court granted summary judgment on that claim along with the others in the case, but there does not seem to have been any issue about standing. *See Conley Publ'g Group Ltd. v. Journal Communications*, No. 00-CV-000222, 2001 WL 1860574, at *2 (Wis. Cir. Ct. Oct. 2, 2001). Nor, for that matter, does the court seem to have considered whether the plaintiff needed to

*(Footnote continued)*

Nor is this particularly surprising given that the statute expressly reflects concern about harm to a competitor.

Thus, extending *Brooke Group* to primary line claims under § 133.05 would be contrary to Wisconsin law.  As to § 133.04, its federal analog, § 2(a) of the Robinson-Patman Act, was directly at issue in *Brooke Group*, and the language of § 133.04 is closer to its federal law counterpart than that of § 133.05.  Nonetheless, we are not aware of any court that has addressed this issue of whether *Brooke Group* should be imported into § 133.04.  Were this Kohler's only counterclaim, the question of whether this step should be taken might appropriately be decided at the pleading stage.  Here, however, Kohler has alleged several discrete bases for challenging Briggs's anticompetitive conduct, and dismissal of the § 133.04 claim would do little to simplify this action, limit discovery, or expedite resolution.  Accordingly, we urge the court to await further factual development before addressing this novel question of statutory purpose and interpretation.

This Court should not dismiss either § 133.04 or § 133.05 as an independent basis for Kohler's fifth cause of action.

### F.    Kohler Has Stated a Claim for Common Law Interference with Prospective Contractual Relations.

Finally, Kohler has stated a claim for intentional interference with prospective contractual relations by alleging that Briggs interfered with Kohler's relations with OEMs and retailers by offering them unlawful bundled rebates and through improper exclusive dealing.  *See* Counterclaim ¶¶ 21, 36-40; *see also Pure Milk Prods. Coop. v. Nat'l Farmers Org.*, 64 Wis. 2d 241, 257-58, 219 N.W.2d 564, 573 (1974) (discussing "common law of interference with contracts"); *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999) (discussing

---

satisfy the *Brooke Group* requirements for purposes of its § 133.05 claim, although, to be sure, in discussing the separate predatory pricing claim under § 133.03, the court found that the plaintiff had failed to offer sufficient evidence of below-cost pricing and recoupment to survive summary judgment.  *See id.* at *2, 4-5.

elements of the claim); *Gray v. Split Rock Hardwoods, Inc.*, No. 01-C-0043-C, 2001 WL 34373159, at *6 (W.D. Wis. July 20, 2001) (same).  When viewed against Rule 8's notice pleading standard, Kohler's common law claim easily passes muster.  *See Gray*, 2001 WL 34373159, at *6 (plaintiff's intentional interference allegations sufficient to notify defendants of the nature of the claim under the liberal pleading requirements of Rule 8); *Simpson v. Ha-Lo Indus., Inc.*, 74 F. Supp. 2d 861, 862 (E.D. Wis. 1999) (declining to dismiss intentional interference claim where allegations were "minimal").

Briggs makes three arguments in support of its motion to dismiss this claim.  First, it argues that Wisconsin recognizes claims for interference only with contractual relations, not "amorphous" business relations.  Mem. at 20.  While Briggs is correct, Kohler's allegations are sufficient to state a claim for intentional interference with prospective contractual relations, as Kohler's counterclaim indicates that Kohler would have entered into contracts with OEMs and retailers were it not for Briggs's anticompetitive conduct.  Counterclaim ¶¶ 21, 25, 37.  The fact that Kohler did not expressly use the word "contract" in its counterclaim is not grounds for dismissal where Kohler has given Briggs adequate notice of its claim.

Second, Briggs criticizes Kohler for failing to identify "an actual or prospective contract . . . between the plaintiff and a third party."  Mem. at 20.  Kohler is not required, however, to identify any existing or potential contracts in its pleading.  *See Gray*, 2001 WL 34373159, at *6 (plaintiff not required to identify specific customers or contracts with which defendants interfered); *Simpson*, 74 F. Supp. 2d at 862 (lack of allegation of existence of any contract or prospective contract with third party does not require dismissal).[15]

---

[15] Both of the cases Briggs cites in support of its motion to dismiss Kohler's common law claims involved decisions on the merits, not the sufficiency of allegations.  *Shank*, 192 F.3d 675 (affirming summary judgment for defendant); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506 (7th Cir. 1994) (affirming grant of preliminary injunction where plaintiff likely to succeed on merits of tortious interference with contract claim).  Thus, they deal with *proof*, not *pleading* requirements, and are inapposite here.

Third, Briggs claims that Kohler has failed to allege that the interference was "wrongful." But Briggs's refrain that "competition is not a tort" (*see* Mem. at 20 (quoting *Shank*, 192 F.3d at 681)), while undoubtedly true as a general matter, rings hollow here, where Kohler has alleged that Briggs interfered with Kohler's prospective contractual rights through *anticompetitive* conduct. The Seventh Circuit in *Shank* notes precisely this distinction, stating that competition "is a defense to a charge of interfering with prospective contractual relations, provided it is fair competition, consistent with anti-trust laws and other principles." *Shank*, 192 F.3d at 687 (citation omitted). Since Kohler has alleged that the same conduct that interfered with its prospective contractual relations also violates the federal and state antitrust laws, Briggs's argument is unavailing.

In short, Kohler's allegations are sufficient to put Briggs on notice of the nature of Kohler's common law tortious interference with contract claim.[16]

### G.   This Court Should Not Sever Kohler's Antitrust Counterclaims from the Rest of This Action.

Briggs moves in the alternative to "sever" Kohler's counterclaims pursuant to Fed. R. Civ. P. 21 and to have them "proceed as a wholly separate case[.]" Mem. at 1, 21. Briggs contends that it is now "'standard practice'" in patent litigation to dispose of antitrust counterclaims in this manner. *Id.* at 1 (quoting *Implant Innovations, Inc. v. Nobelpharma AB*, No. 93 C 7489, 1996 WL 568791, at *2 (N.D. Ill. Oct. 2, 1996)).

Far from "standard practice," a Rule 21 severance of Kohler's counterclaims would violate the Federal Rules, the governing jurisdictional statutes, and numerous Federal Circuit and Seventh Circuit precedents. Cases like *Implant Innovations* have nothing to do with Rule 21 severance, but instead involve the entirely distinct question of separate *trials* of patent and

---

[16] Kohler submits that there can be no serious question that its counterclaims, if proven, would constitute violations of the federal and state antitrust laws. In the event that the Court decides, nevertheless, that Kohler's counterclaims do not provide Briggs with sufficient notice for pleading purposes, Kohler respectfully requests leave to amend them.

antitrust claims pursuant to Fed. R. Civ. P. 42(b), with the results of those trials embraced by a single judgment.  *See* 1996 WL 568791, at *2-3.  Briggs likewise miscites *Hewlett-Packard Co. v. GenRad, Inc.*, 882 F. Supp. 1141 (D. Mass. 1995), for the proposition that "[s]everance is particularly appropriate in patent cases with antitrust counterclaims."  Mem. at 22.  Like *Implant Innovations*, *Hewlett* involves nothing more than a Rule 42(b) motion for separate trials.  Briggs repeatedly uses Rule 42 cases in arguing for a Rule 21 severance — a practice the Federal Circuit has condemned as "inaccurate and misleading" given that Rule 42(b) "has nothing to do with judgments, or separate cases, or appeals."  *Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1426 n.1, 1430 (Fed Cir. 1984).  Indeed, the Federal Circuit has emphasized that it is the Rule 42 separation of *trial* of patent and antitrust claims, *not* outright Rule 21 *severance*, that "reflect[s] the now-standard practice[.]"  *In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986), *overruled on other grounds*, 141 F.3d 1059, 1068 (1998).[17]

---

[17]  Briggs also relies heavily on *Dow Corning Corp. v. Surgitek, Inc.*, 61 F.R.D. 578, 580 (E.D. Wis. 1973).  *See* Mem. at 22.  That case, however, appears to be an example of how some courts inappropriately "use the terms 'severance' and 'separate trials' interchangeably," as discussed on the next page in the block quote from *Moore's Federal Practice*.  Close analysis of *Dow* makes clear that the motion "to sever and stay proceedings" on the non-patent issues was "pursuant to Rule 21 *and 42(b)*"; the relief sought was simply to defer the non-patent issues "*until resolution of the infringement and validity issues*."  61 F.R.D. at 579-80 (emphasis added).  Later cases have cited *Dow* only as authority for ordering separate trials under Rule 42(b), not severance under Rule 21, though they also commonly use the term "severance."  *See, e.g.*, *Johnson & Johnson v. Kimberly-Clark Corp.*, 203 U.S.P.Q. 1008, 1011 (E.D. Wis. 1978) ("It has been suggested that in any patent infringement suit in which antitrust violations are the basis for a defense or counterclaims the court should order separate trials of the antitrust issues and patent issues pursuant to Rule 42(b).  Case authority for the propriety of severance in this manner is abundant.") (citing *Dow*); *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 86 F.R.D. 694, 701-02 (E.D.N.C. 1980) (same).  Had the plaintiff in *Dow* literally sought to "sever" the claims into separate cases, there would have been nothing left to stay under Rule 42(b).

Briggs's reliance on *Grigsby v. Kane*, 250 F. Supp. 2d 453 (M.D. Pa. 2003), is similarly misplaced.  *See* Mem. at 22.  The district court in that case granted the motion of one plaintiff to "sever" his claims from those of the other plaintiff where the two plaintiffs "have alleged two sets of claims that are factually dissimilar" and "completely distinct" from each other.  *Id.* at 456.  The motion to "sever," however, was "GRANTED for purposes of dispositive motion practice and trial only," thus demonstrating that the court was merely bifurcating trial of the claims, not truly splitting the controversy into separate cases.  *Id.* at 461; *see also id.* at 456.  This is

*(Footnote continued)*

There are critical differences between a Rule 42(b) separation for trial and a Rule 21 severance of claims:

> Unfortunately, many lawyers (and, surprisingly, some courts) use the terms 'severance' and 'separate trials' interchangeably … [which] confuses fundamental distinctions between the two procedures.  Severance under Rule 21 results in separate actions. … In other words, the severed claim proceeds as a discrete, independent suit.  It and the original case result in their own final judgments from which appeals may be taken.  In contrast, an order of separate trials [pursuant to Rule 42(b)] does not result in the filing of separate cases.  Instead, it simply leads to two or more separate factual inquiries in the context of a single, properly joined case.  No matter how many separate trials the court may order, they remain part of a single case.

4 James Wm. Moore et al., *Moore's Federal Practice* § 21.06[1] (3d ed. 2004); *see also* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2387 (2d ed. 1995).

This Court should deny Briggs's motion for a Rule 21 severance.  Kohler does not, however, object to separate *trials* pursuant to Rule 42(b) if the Court believes this would be the fairest and most efficient approach under all of the circumstances — *provided* that any such separation allows the patent and antitrust claims to proceed on parallel, coordinated tracks.  Contrary to Briggs's contentions (*see* Mem. at 1, 22-23), the patent and antitrust claims *do* involve overlapping factual and legal issues, and will benefit from coordinated pretrial discovery and scheduling.  *See* p. 32 *infra.*

Briggs makes essentially three arguments in support of a Rule 21 severance.  We address each in turn.

---

confirmed by a WESTLAW check, which reveals that the two separated claims have continued to be part of a single case.  *See Grigsby v. Kane*, No. 1:CV-99-2083, 2005 WL 348303 (MD. Pa. Feb. 2, 2005); *Grigsby v. Kane*, No. 1:CV-99-2083, 2005 WL 348305 (M.D. Pa. Feb. 9, 2005).

   1.   **Briggs Has Identified No Joinder Defects or Similar Problems that Would Justify a Rule 21 Severance.**

Although the last sentence in Rule 21 gives this Court broad discretion to sever a claim against a party,[18] that discretion must be exercised in a manner consistent with other provisions of the Federal Rules and the underlying purposes of Rule 21.  The plain language of Rule 21's title — "Misjoinder and Non-Joinder of Parties" — makes clear that the rule is principally intended to serve as a mechanism for remedying *defects* in joinder or otherwise avoiding significant prejudice or litigation inefficiencies resulting from joinder.  Indeed, the "[m]ore common[]" and "primary" use of Rule 21 is to remedy the improper or prejudicial joinder of multiple *parties*.  7 *Federal Practice and Procedure* §1689, at 514-15; *see also* 4 *Moore's Federal Practice* § 21.02[1] (Rule 21 is aimed primarily at "specific *party* joinder problems") (emphasis added).  Nearly all of the Rule 21 cases cited by Briggs fall into this category.  *See* Mem. at 21-22.  This Court's decision in *Insolia v. Philip Morris, Inc.*, 186 F.R.D. 547, 548-50 (W.D. Wis. 1999), for example, involved a motion to sever *parties* that had been *improperly* joined in violation of Fed. R. Civ. P. 20.  Likewise, the issue in *In re High Fructose Corn Syrup Antitrust Litig.*, 293 F. Supp. 2d 854, 861-63 (C.D. Ill. 2003), was whether certain parties should be severed so as not to be subject to the "prejudicial spillover effect" of certain "highly charged evidence" that was admissible only against a single defendant.  Similarly, *Grigsby v. Kane*, 250 F. Supp. 2d 453, 456 (M.D. Pa. 2003), involved the "severance" of one plaintiff's claims from those of another plaintiff where the two sets of claims were "factually dissimilar" and "completely distinct."  *See also* note 17 *supra*.  Whether the severance is of parties or of claims, the function of Rule 21 is to remedy unintended, prejudicial *defects* in joinder or otherwise to cure similar problems involving the risk of serious prejudice or judicial inefficiency (for

---

   [18]  That last sentence provides:  "Any claim against a party may be severed and proceeded with separately."

example, the loss of jurisdiction or venue due to an otherwise-proper joinder).  *See generally* 7 *Federal Practice and Procedure* §§ 1683, 1685, 1689.[19]

Briggs appears to contend that the joinder of claims in this case is somehow defective because (a) the antitrust counterclaims "do not arise from the same 'transaction or occurrence' as Briggs's patent claims"; (b) the patent and antitrust claims involve "different" facts, witnesses, and legal issues; and (c) the patent and antitrust claims "are not governed by the same body of law[.]"  Mem. at 22.  None of these arguments suggests a misjoinder or comparable problem that would warrant a Rule 21 severance.

(a)  Unlike *party* joinder under Fed. R. Civ. P. 20(a), there is no "same-transaction-or-occurrence" requirement in the context of Kohler's permissive counterclaims.  Both Rule 13(b) and Rule 18(a) give Kohler the right to plead the claims it has asserted in this case.  *See* Fed. R. Civ. P. 13(b) ("A pleading may state as a counterclaim any claim against an opposing party *not* arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.") (emphasis added); Fed. R. Civ. P. 18(a) ("A party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as the party has against an opposing party.").  If a permissive counterclaim could be severed under Rule 21 simply because it involved a different transaction or occurrence between the same parties, Rules 13(b) and 18(a) would mean very little.  The combination of different transactions and occurrences between the same parties in one case is *encouraged* under the rules, not regarded as a "defect."

---

[19] Briggs's reliance on *Toro Co. v. Alsop*, 565 F.2d 998 (8th Cir. 1977), is similarly misplaced.  *See* Mem. at 22.  The patent claims at issue in that case were severed from the antitrust claims so they could be transferred to another district court that was already overseeing litigation involving the same patents.  *See id.* at 999 ("Obviously, the [severed] patent issues . . . are embraced, at least in large measure, in the patent case pending in" the transferee court); *see also* 4 *Moore's Federal Practice* § 21.06[2] ("the fact that a claim may be subject to transfer to a more appropriate venue is a valid reason to order severance").  Transfer is not an issue in this case.

(b)  Because a Rule 13(b) permissive counterclaim may raise claims involving different transactions or occurrences, such a claim by definition may present "different" facts and issues than the original claim.  Here again, it cannot be a "defect" to join an unrelated claim where authorized by the Federal Rules.

In addition, although the patent and antitrust claims in this case clearly raise some distinct issues, there is also likely to be significant overlap in the factual and legal issues.  For example, the parties' marketing, sales, and pricing information will be relevant to both sets of claims, and the document discovery and witness depositions on these issues will overlap both claims.  In addition, relevant market analysis will be necessary for both sets of claims.  Any claim by Briggs for lost profits on its patent claims, for example, will require a determination of the parties' respective market shares[20] and an analysis of any bundled rebates or other promotions offered by Briggs so as to determine the "actual profits" that Briggs would have realized on any lost sales.  Of course, market share issues and bundled rebate activity are also key elements of the antitrust counterclaims.[21]  Thus, far from being a "defect," combining these claims in the same case will promote efficient discovery on common issues and minimize any potential for duplication of effort.

(c)  Nor is it at all relevant that Kohler's counterclaims involve a different "body of law" than Briggs's patent claims.  Mem. at 22.  By virtue of the broad and exclusive appellate jurisdiction conferred on the Federal Circuit by 28 U.S.C. § 1295(a) in cases arising in part under § 1338 (*see* pp. 34-37 *infra*), that court routinely construes federal and state laws outside of the

---

[20]  *See, e.g.*, *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577-80 (Fed. Cir. 1989) (limiting lost profits award based on patentee's actual market share).

[21]  Similarly, a claim for lost sales in the patent context requires an analysis of whether and to what extent there are "acceptable non-infringing substitutes" for the patented product.  *See* Robert L. Harmon, *Patents and the Federal Circuit* § 15.1(b), at 821-24 (6th ed. 2003).  In antitrust, the relevant product market is defined by "reasonably interchangeable alternatives."  *See Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 958 F. Supp. 992, 997 (E.D. Pa. 1997).  Clearly discovery directed at one of these issues will significantly overlap with the other.

patent area and has extensive experience in "divin[ing]" the precedents of other courts in a broad range of "complex area[s] of the law." Mem. at 24. *See Atari*, 747 F.2d at 1440 (with respect to issues that do not fall within the Federal Circuit's patent expertise, that court applies "the established, discernable law of the involved circuit" and "sit[s] as though it were a panel of" that circuit; counsel are required to brief and argue the case as if they were appearing before the regional circuit); *see generally* 8 Donald S. Chisum, *Chisum on Patents* § 21.02[5][b][iv][B], at 21-429 to 21-435 (2004); Robert L. Harmon, *Patents and the Federal Circuit* § 20.2(b), at 1150-61 (6th ed. 2003).[22] That the case may involve different "bod[ies] of law" is thus a normal and expected incident of patent jurisdiction, not a defect in joinder or a comparable problem justifying the remedy of a Rule 21 severance.

> ### 2. All of Briggs's Concerns About Potential Juror Confusion and Trial Delay Can Be Accommodated Through the Less Drastic Remedy of a Rule 42(b) Separation of Trials.

Briggs argues that Kohler's antitrust counterclaims "threaten to distract the jury from Briggs' intellectual property case, cause jury confusion, and may cause a delay in the patent trial." Mem. at 21; *see also id.* at 23 (complaining that joint trial of patent and antitrust issues "will become complex, unwieldy, confusing, and less focused on the patent claims"). Briggs implores the Court to enter a Rule 21 severance order to "allow the patent case to proceed independently on the current schedule, avoiding needless jury confusion and prejudice to Briggs." *Id.* at 1.

Every one of Briggs's concerns can readily be accommodated through the less drastic remedy of holding separate trials pursuant to Rule 42(b); outright severance under Rule 21 is entirely unnecessary to avoid juror confusion or a delay in the scheduled patent trial. Kohler

---

[22] *See also Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1575-76 (Fed. Cir. 1984) ("Where the regional circuit court has not spoken, we need to predict how that regional circuit would have decided the issue in light of the decisions of that circuit's various district courts, public policy, etc.").

stands ready to work with Briggs in structuring discovery and other pretrial activities to ensure that the patent trial commences as scheduled and that the antitrust trial can follow as soon thereafter as feasible.  The Court has ample flexibility under Rules 16 and 42 to amend the existing scheduling order by extending the deadlines for dispositive motions and completion of discovery on the antitrust issues.  *See* Fed. R. Civ. P. 16(c) and 1983 Advisory Committee Notes; *In re Innotron Diagnostics*, 800 F.2d at 1078 (district court bifurcated patent and antitrust trials, and set a later cut-off date for discovery pertaining only to the antitrust claims).  This would allow the patent and antitrust claims to proceed on parallel, coordinated tracks, thus avoiding the duplication and inefficiencies that would result if Kohler were required to prosecute its antitrust counterclaims in a new case starting from scratch.  *See* p. 32 *supra*.

> **3.**     **Briggs's Attempt To Use Rule 21 To Steer Any Antitrust Appeal to the Seventh Circuit Violates the Governing Jurisdictional Statutes and Is Impermissible Forum Shopping.**

Briggs candidly admits that there is one additional reason it is seeking Rule 21 severance: to ensure that "the Seventh Circuit will hear any appeal of the antitrust claims" rather than the Federal Circuit.  Mem. at 24.  Briggs insists that the Seventh Circuit, not the Federal Circuit, "is the appropriate appellate court" to hear the antitrust issues in this case; "[t]his is as it should be." *Id.*

Briggs is wrong on many levels.  Its argument flies in the face of the governing jurisdictional statutes, is squarely at odds with a generation of both Federal Circuit and Seventh Circuit decisions, and is nothing more than rank forum shopping.  This Court's jurisdiction obviously is grounded primarily on 28 U.S.C. § 1338(a).  *See* Compl. at ¶ 3.  Title 28 U.S.C. § 1295(a)(1) unambiguously provides that the Federal Circuit "*shall* have *exclusive jurisdiction* of an appeal from a final decision of a district court of the United States . . . if the jurisdiction of that court was based, *in whole or in part*, on section 1338 of this title" (emphasis added).  Thus, the Federal Circuit has "exclusive jurisdiction" over the entirety of any case where "the jurisdiction of the District Court was based at least 'in part' on § 1338." *Christianson v. Colt*

34

*Indus. Operating Corp.*, 486 U.S. 800, 807 (1988).  This broad exclusivity governs even where the issues ultimately appealed are not within the Federal Circuit's patent expertise and involve federal and state claims that, but for their joinder with a § 1338(a) claim, would go to a regional court of appeals or a state court.  As the Federal Circuit has explained:

> The path of appeal is determined by the basis of jurisdiction in the district court, and is not controlled by the district court's decision or the substance of the issues that are appealed.  The reasons are pragmatic:  to avoid creating fresh opportunities for forum shopping; to avoid bifurcation of issues and cases at trial and on appeal; to remove uncertainty and the abuses of procedural maneuvering; and, ultimately, to facilitate resolution of disputes.

> Thus, the direction of appeal to the Federal Circuit does not change during or after trial, even when the only issues remaining are not within our exclusive jurisdiction.

*Abbott Labs. v. Brennan,* 952 F.2d 1346, 1349-50 (Fed. Cir. 1991).[23]  Consistent with these principles, the Federal Circuit has emphasized that the use of procedural devices like Rules 21, 42(b), or 54(b) does not affect scope of its appellate jurisdiction under § 1295(a), which "is based on the complaint that was filed where the action originated."  *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1342-44 (Fed. Cir. 2003).

The Seventh Circuit takes a similarly expansive view of the Federal Circuit's exclusive jurisdiction under § 1295(a).  Far from contending that it is the more "appropriate appellate court" to hear claims about the meaning of its own precedent, Mem. at 24, the Seventh Circuit has emphasized that its potential expertise "is neither here nor there" in determining subject matter jurisdiction in a case like this:

> [Governing precedent] tells us to take § 1295(a)(1) literally and not attempt to determine on the basis of subject matter to which court an appeal 'ought' to go. Jurisdictional rules should be simple and clear.  Which court is best suited to

---

[23]  *See also Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999); *Atari*, 747 F.2d at 1435 ("Congress specifically rejected [the] … suggestion that [the Federal Circuit] should have only 'issue' jurisdiction and that appeals involving patent and non-patent issues should be bifurcated.").

decide a given *issue* is not at all clear, and is neither here nor there under §
1295(a)(1).

*Unique Concepts, Inc. v. Manuel*, 930 F.2d 573, 575 (7th Cir. 1991) (emphasis in original)

(Easterbrook, J.).  Applying these principles, the Seventh Circuit has repeatedly deferred to the

Federal Circuit's exclusive jurisdiction over all claims embraced by § 1295(a)(1), even where the

district court "resolved the case without reference to patent law."[24]

Thus the underlying premise of Briggs's argument — that Rule 21 may be used to steer a

claim from one appellate court to another — is wrong; appellate jurisdiction does not change

based on severance.  *See Apotex*, 347 F.3d at 1343.  But even if a district court could affect

appellate jurisdiction in this manner, the Federal Circuit has emphasized that a litigant may not

manipulate the Federal Rules "solely for the purpose of directing an appeal to the circuit desired

by counsel"; it is impermissible to employ the rules "for the *sole purpose* of ousting [the Federal

Circuit] from the jurisdiction it was granted under § 1295(a)(1)."  *Atari*, 747 F.2d at 1431-32

(emphasis in original); *see also id.* at 1432 ("Permitting this court's jurisdiction over individual

counts to be manipulated through the expedient of mid-stream tactical procedural motions filed

solely for the purpose of manipulation would be the antithesis of [the] fundamental objective of

---

[24]  *Aura Lamp & Lighting, Inc. v. Int'l Trading Corp.*, 325 F.3d 903, 907 (7th Cir. 2003)
(dismissing appeal for lack of jurisdiction where district court dismissed for want of prosecution
a case arising in part under § 1338); *see also In re BBC Int'l, Ltd.*, 99 F.3d 811, 813 (7th Cir.
1996) ("If the district court's jurisdiction rests on a patent claim, then an appeal from an entirely
non-patent disposition goes to the federal circuit."); *Kennedy v. Wright*, 851 F.2d 963, 965 (7th
Cir. 1988) (transferring appeal to Federal Circuit, which had "exclusive jurisdiction" over appeal
of a case arising under § 1338 even though the case was resolved on grounds of state property
law:  "[T]he jurisdiction of [the district] court was fixed by what the complaint contained, not by
how it resolved the dispute.  Section 1295(a)(1) says that if the district court's jurisdiction rested
on § 1338, then the Federal Circuit has exclusive jurisdiction of the appeal.  That, it seems, is
that.").  The Seventh Circuit has held open the question whether, *after* a claim has been fully
resolved by a district court, Fed. R. Civ. P. 54(b) "can be used to direct an appeal to a particular
circuit" in appropriate circumstances.  *Unique Concepts*, 930 F.2d at 575.  This question more
recently has been answered in the negative by the Federal Circuit, which has emphasized that
neither Rule 54, Rule 21, nor any of the other Federal Rules may be used to divest it of its
exclusive appellate jurisdiction under § 1295(a).  *See Apotex*, 347 F.3d at 1343.

Congress" in creating the Federal Circuit).  This *precisely* describes Briggs's request to sever.
We have shown above that all of Briggs's other arguments for severance are either illegitimate or
may readily be accommodated through the less-drastic step of Rule 42(b) separation for trial.  All
that is left is Briggs's desire to steer any antitrust appeal to the Seventh Circuit rather than to the
Federal Circuit.  That is an impermissible motivation.  Briggs's attempted use of Rule 21 is thus
contrary to both Federal Circuit and Seventh Circuit precedent, and is "in direct defiance of [the]
intent of Congress."  *Atari*, 747 F.2d at 1435.

## IV.    CONCLUSION

For all of the reasons discussed above, this Court should deny Briggs's motion to dismiss
Kohler's antitrust counterclaims and deny its motion to sever those claims.

Dated this 3rd day of June, 2005.

Respectfully submitted,

David J. Harth
Charles G. Curtis, Jr.
David E. Jones
Christopher G. Hanewicz
David L. Anstaett
HELLER EHRMAN LLP
One East Main Street
Suite 201
Madison, Wisconsin  53703-5118
Tel:  (608) 663-7460
Fax:  (608) 663-7499

Robert A. Rosenfeld
Scott A. Westrich
Kerry C. Klein
HELLER EHRMAN LLP
333 Bush Street
San Francisco, California  94104-2878
Tel:  (415) 772-6000
Fax:  (415) 772-6268

*Attorneys For Defendant and*
*Counterclaim Plaintiff Kohler Co.*

37